## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| BRANDI N. STAIB, | ) | CASE NO. 4:23-CV-02353-JDA |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL |
| v. | ) | ARMSTRONG |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION** |
| SECURITY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.      INTRODUCTION

Plaintiff Brandi N. Staib ("Ms. Staib") seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Social Security Disability Insurance Benefits ("DIB"). This matter is before the Court pursuant to 42 U.S.C. §§ 405(g) and Local Rule 72.2(b). (*See* ECF non-document entry dated December 11, 2023). The parties have consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1. (ECF No. 5). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## II.     PROCEDURAL HISTORY

On February 16, 2022, Ms. Staib filed her application for DIB. (Tr. 171). Ms. Staib's application related to her depression, anxiety, insomniac disorder, PTSD, and Crohn's disease. (Tr. 199).

The Social Security Administration ("SSA") denied Ms. Staib's application initially and upon reconsideration. (Tr. 64, 71). Ms. Staib requested a hearing before an administrative law judge ("ALJ"). (Tr. 95). The ALJ held a telephonic hearing on May 16, 2023, at which Ms. Staib

was represented by counsel. (Tr. 33). Ms. Staib testified, as did an impartial vocational expert ("VE"). On May 25, 2023, the ALJ issued a written decision, finding that Ms. Staib is not disabled. (Tr. 13). The ALJ's decision became final on March 21, 2022, when the Appeals Council declined further review. (Tr. 1).

On December 11, 2023, Ms. Staib filed her Complaint, challenging the Commissioner's final decision. (ECF No. 1). Ms. Staib asserts the following assignment of error:

(1)     The ALJ's RFC determination is unsupported by substantial evidence because he failed to properly evaluate the opinion from Sheila Kohler, MSW, LSW.

(ECF No. 7, PageID # 473).

## III.    BACKGROUND

### A.    <u>Personal, Educational, and Vocational Experience</u>

Ms. Staib was born in 1980 and was 40 years old on the alleged onset date. (Tr. 171). She is not married. *Id*. She has one child. (Tr. 172). Ms. Staib has a high school degree. (Tr. 200). She has prior work experience at a medical insurance company and as a cashier, shift leader, assistant manager, and store manager at a gas station. *Id*.

### B.    <u>Relevant Hearing Testimony</u>

#### 1.    *Ms. Staib's Testimony*

Ms. Staib testified that she previously worked as the manager of a gas station, but that she quit her job because she had a mental breakdown. (Tr. 40). She testified that hospitalization was considered, but that she chose not to receive inpatient care because she did not want to be in a psychiatric ward, and she thought she could handle her issues without it. *Id*.

Ms. Staib testified that she experiences depressive periods lasting approximately two weeks. (Tr. 42). She testified that she typically has one week where she is not depressed followed by two weeks of depression. *Id*. She also testified that, during a depressive period, she has to force herself to get out of bed and to shower, and that she feels hopeless, worthless, and useless. *Id*. Ms.

2

Staib further testified that she will experience manic periods lasting for approximately four days, during which she will clean the whole house. (Tr. 42-43).

With respect to her anxiety, Ms. Staib testified that she cannot handle many people, and that she could not make it to her step-grandmother's celebration of life because her anxiety was so high that she stayed in the car doing breathing exercises. (Tr. 43). She also testified that she will occasionally experience panic attacks, but that they have improved since she stopped working. (Tr. 43-44). Her panic attacks typically last for 15 to 20 minutes, during which she begins crying and experiences chest pain and rapid breathing. (Tr. 44). Ms. Staib testified that she is not able to sleep completely through the night because she wakes up with racing thoughts. (Tr. 41). She further testified that she experiences nightmares as a result of her PTSD. (Tr. 44). Ms. Staib testified that she takes both Abilify and Venlafaxine for her conditions. (Tr. 39). She testified that, since they upped her dosage of Abilify three months previously, her depressive periods are shorter, and that they used to last four to six weeks. (Tr. 42-43).

Ms. Staib testified that, on a typical day, she will get her boyfriend's daughter off to school, and then will sit by herself. (Tr. 45). She testified that she rarely leaves the house and barely talks to anyone. *Id*. If she is experiencing a manic period, she will clean the house, and will also cook and do laundry. (Tr. 45-46). If she in a depressive period, she will lie around the house. *Id*. She testified that she can go shopping by herself, but that she has to do breathing exercises first. (Tr. 47). She also testified that she participated in a Santa's workshop for a couple days at her boyfriend's daughter's school, but that the experience was a little overwhelming. (Tr. 48). She testified that she is uncomfortable being around even small groups of people, even if she does not have to interact with them. (Tr. 51). She said that she does not believe she could make it through an eight-hour work day without relying on breathing exercises due to her anxiety. (Tr. 52).

2. ***Vocational Expert's Testimony***

The ALJ asked the VE to consider a hypothetical individual with Ms. Staib's age and education who did not have any exertional limitations but who would be limited to simple, routine tasks involving no more than simple work-related decision making; would be limited to occasional and superficial interaction with others; could not direct the work of others or be responsible for the safety or welfare of others; could not perform assembly line work; and could tolerate occasional workplace changes that were explained in advance. (Tr. 54). The VE testified that the hypothetical individual could not perform Ms. Staib's past work as a retail manager but could perform jobs existing in the national economy, including work as a cleaner, store laborer, or folder. (Tr. 54-55). The ALJ next asked if the hypothetical individual could still perform those jobs in the individual were limited to work in a non-public setting. (Tr. 55). The VE testified that those jobs would still be available. *Id.*

The ALJ next asked if the hypothetical individual could perform the identified jobs if the individual were limited to occasional, superficial interaction with a supervisor but could not work in proximity to or have any contact with co-workers or the general public. (Tr. 55-56). The VE testified that those additional limitations would be work-preclusive. (Tr. 56). The VE further testified that employers would tolerate an employee being off task ten to fifteen percent of the time, but that any additional off-task time would be work-preclusive. *Id.* In response to a question from Ms. Staib's counsel, the VE testified that the hypothetical individual would not be able to maintain employment if the individual was unable to interact with coworkers or supervisors for five hours out of an eight-hour workday. (Tr. 58).

**C.    Relevant Opinion Evidence**

1. ***Sheila Kohler, MSW, LSW***

On March 22, 2022, Sheila Kohler, Ms. Staib's counselor, completed a residual functional

capacity assessment of Ms. Staib. (Tr. 378). Ms. Kohler opined that mood instability could trigger Ms. Staib's symptoms, which could prevent her from completing a successful work day. *Id*. Ms. Kohler also opined that Ms. Staib exhibited a number of symptoms, including depressed mood, appetite disturbance, observable psychomotor agitation or retardation, feelings of guilt or worthlessness, diminished interest in almost all activities, sleep disturbance, decreased energy, difficulty concentrating or thinking, distractibility, increase in goal-directed activity or psychomotor agitation, restlessness, difficulty concentrating, preoccupation with intrusive thoughts, fatigue, irritability, sleep disturbance, and disproportionate fear or anxiety about at least two different situations. *Id*. Ms. Kohler further opined that Ms. Staib experienced symptoms of trauma-related disorders, including avoidance of external reminders, increases in arousal or reactivity, involuntary re-experiencing of the traumatic event, and disturbance in mood or behavior. (Tr. 380).

Ms. Kohler opined that Ms. Staib had extreme limitations in her ability to interact with others and concentrate, persist, or maintain pace; a marked limitation in her ability to understand, remember, or apply information; and a moderate limitation in her ability to adapt or manage herself. (Tr. 380-82). She also opined that Ms. Staib would be off-task over 85-90 percent of the work day, that she would miss more than four days per month of work, and that she is incapable of even low stress work. (Tr. 382-83). The ALJ found that Ms. Kohler's opinion was unpersuasive because it was not consistent with the overall record. (Tr. 25).

### 2.    *State Agency Psychologists*

On April 9, 2022, Aracelis Rivera, Psy.D., a state agency psychologist, opined that Ms. Staib had moderate limitations in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors,

and get along with coworkers or peers. (Tr. 69). Dr. Rivera also opined that Ms. Staib was capable of occasional complex and lengthy tasks and had no limits on her ability to perform simple routine tasks, but that she required occasional breaks from sustained concentration and rapid pace. *Id*. Dr. Rivera further opined that Ms. Staib could have occasional contact with the public and had no limits on her ability to interact with coworkers. *Id*. On June 12, 2022, Robyn Murry-Hoffman, Psy.D., largely affirmed Dr. Rivera's findings on reconsideration, but also opined that Ms. Staib should not have strict production demands and should not be required to engage in prolonged periods of focus and concentration. (Tr. 76).

The ALJ found that the opinions of the state agency psychologists were largely persuasive but were inconsistent with the record to the extent they opined that Ms. Staib could perform occasional complex and lengthy tasks. (Tr. 26).

### D.    Relevant Medical Evidence

On August 17, 2021, shortly before her alleged onset date, Ms. Staib presented to Heritage Valley Health System, complaining of worsening depression. (Tr. 262). Ms. Staib reported that her depression had increased over the last couple months and that her job was very stressful. *Id*. Ms. Staib also stated that she thought about crashing her car a couple of weeks previously, but denied any current suicidal plans. *Id*. Ms. Staib also stated that she would never act on any plan due to protective factors, including her son and sister. *Id*. She reported that her depression had previously been successfully controlled by Celexa. *Id*. She also stated that she intended to quit her job, and that she believed her stress would decrease when she was no longer working. *Id*. On examination, her mood and affect were normal. (Tr. 264). She was diagnosed with depression and anxiety, given a psychiatric referral, and started on Hydroxyzine and Celexa. *Id*.

Ms. Staib had a follow-up visit at Heritage Valley Health System on September 14, 2021. (Tr. 266). Ms. Staib reported that she was doing much better, and that her anxiety had improved

since she quit her job. *Id*. She denied any homicidal or suicidal ideation. *Id*. On examination, her mood and affect were normal. (Tr. 268).

On October 29, 2021, Ms. Staib established treatment at Liberty PsyCare, complaining of depression, anxiety, feelings of hopelessness, low energy, stress, sleep impairments, negative self-thoughts, constant worry, and neglect of herself and household tasks. (Tr. 270). Ms. Staib reported that she had experienced depression and anxiety since she was 19, and that her symptoms had increased since her son decided to live with his father. *Id*. She reported a history of verbal and emotional abuse and childhood sexual abuse. (Tr. 272). She also reported that she had no energy to shower or clean the house. *Id*. On examination, Ms. Staib was moderately depressed, alert and cooperative, and displayed an affect consistent with her mood. (Tr. 271). She was also adequately groomed; oriented for time, place, and person; and displayed adequately articulated speech and a normal rate, logical thought processes and thought content, and good insight and judgment. *Id*. She denied suicidal and homicidal thoughts. *Id*. She was assessed as a moderate risk for suicide with significant ideation but no plan or intent. *Id*.

Ms. Staib had a follow-up session with Ms. Kohler on November 5, 2021. (Tr. 278). Ms. Staib reported experiencing increased stress as a result of fighting with her boyfriend and ongoing conflict with her son. *Id*. On examination, she was cooperative, restless, and moderately anxious, with fast, slightly loud speech, good eye contact, adequate grooming, and normal concentration and thought content. *Id*. It was noted that Ms. Staib had made improvements that week with household chores, and that she was able to wash laundry and dishes and to cook dinner four times. (Tr. 280).

Ms. Staib saw Ms. Kohler again on November 10, 2021. (Tr. 288). On examination, she was restless, tearful, moderately anxious, and moderately depressed, with good eye contact, fast and loud speech, and normal thought processes and thought content. *Id*. At another visit on

7

November 24, 2021, Ms. Staib was alert and cooperative with a euthymic mood, normal speech, and normal thought processes and content. (Tr. 292).

Ms. Staib had another follow-up visit with Ms. Kohler on December 10, 2021. (Tr. 296). Ms. Staib reported that she was depressed by the recent death of her uncle and had stayed in bed for two days, but that she was otherwise doing well. *Id*. She reported that she cleaned the house for four hours the prior week and was attempting to stay out of bed most days. *Id*. She also reported assisting with her stepdaughter's Santa's workshop event at school for three days, which she said was a step to meeting new people and increasing her social interaction. *Id*. On examination, her mood was manic and euphoric, with pressured, fast, and expressive speech, a shifted position, and racing thoughts. (Tr. 296-97).

On December 13, 2021, Ms. Staib had a telehealth medication management appointment. (Tr. 301). Ms. Staib was friendly, moderately depressed, and moderately anxious, with racing thoughts and normal speech, attention, concentration, memory, judgment, and insight. (Tr. 302). Her Celexa was increased, and she was prescribed Abilify. (Tr. 303). It was noted that she had stopped taking Hydroxyzine. *Id*.

Ms. Staib had another session with Ms. Kohler on December 28, 2021. (Tr. 309). She reported experiencing social anxiety at her mother's wedding, and said that she was having difficulty maintaining a consistent hygiene regimen. *Id*. On examination, she was restless, moderately anxious, moderately depressed, alert, cooperative, and tearful, with mild inattention to grooming, racing thoughts, and coherent thought processes. (Tr. 309-10). At a medication management visit on January 18, 2022, as a result of which her Abilify dosage was increased, Ms. Staib was mildly anxious and moderately depressed with normal speech, good insight and judgment, and logical thought processes. (Tr. 314).

Ms. Staib saw Ms. Kohler again on January 31, 2022. (Tr. 317). She was alert, cooperative,

and crying during the session, with a moderately depressed and moderately anxious mood and normal speech, thought processes, and thought content. (Tr. 317-18). On February 7, 2022, she reported increased financial stress from not working. (Tr. 321). She presented with a moderately depressed and mildly anxious mood and normal speech, thought processes, and thought content. (Tr. 321-22). Her symptoms were essentially unchanged at another visit on February 14, 2022, and Ms. Staib reported that her racing thoughts at night had decreased. (Tr. 325-27).

Ms. Staib had another session with Ms. Kohler on February 21, 2022. (Tr. 332). She reported feeling stress over her relationship with her boyfriend. *Id*. It was noted that Ms. Staib had difficulty following her treatment plan, but that she had decreased the number of hours she spent in bed and increased the time she spent on household chores. (Tr. 334).

At the next visit on February 28, 2022, Ms. Staib was depressed over the death of her uncle. (Tr. 336). Ms. Staib was again depressed at her session with Ms. Kohler on March 7, 2022. (Tr. 340). She reported feeling like she had tunnel vision and experiencing an increasing number of vivid dreams. *Id*. She also reported difficulties with daily hygiene but said that she had been crafting, which helped her with racing thoughts. (Tr. 342). On examination, she was distant and crying, severely depressed, and moderately anxious, with racing thoughts and concentration difficulty but no signs or symptoms of psychosis. (Tr. 340-41).

On March 14, 2022, Ms. Staib reported that she felt like everything in her life was a stressor, and that she worried about worst case scenarios constantly and had difficulty controlling racing thoughts. (Tr. 348). She presented as moderately anxious and moderately depressed, with normal thought processes and thought content and adequately articulated speech. (Tr. 349-50). On March 31, 2022, Ms. Staib reported experiencing a low mood, difficulty concentrating, poor sleep, and irritability since her Ambien had been discontinued. (Tr. 354, 356). On examination, she displayed racing thoughts, restless behavior, and a mild impairment in concentration. (Tr. 354-

55). At her next medication management visit on April 11, 2022, her Celexa was discontinued and her Abilify was increased from 5mg to 10mg. (Tr. 359). She was also prescribed Venlafaxine. *Id*.

At a session with Ms. Kohler on April 14, 2022, Ms. Staib reported increased anxiety, depression, irritability, and difficulty sleeping. (Tr. 363). On examination, she was restless and tense, moderately depressed, mildly anxious, and moderately irritable. (Tr. 363-64). She also displayed poorly articulated speech and mildly distractible thought processes. *Id*. On April 25, 2022, she reported that a change in her medication had decreased her irritability. (Tr. 367). She also reported that she was able to shower three times the previous week. (Tr. 369). On May 2, 2022, she reported feeling stress over her financial circumstances and the denial of her disability claim. (Tr. 371). It was noted that she had been completing chores regularly. (Tr. 373). On May 9, 2022, her Venlafaxine was increased. (Tr. 376).

The next session in the record was on March 13, 2023. (Tr. 406). Ms. Staib reported increased irritability, low mood, difficulty sleeping, difficulty concentrating, continued anxiousness when leaving her home, and difficulty getting out of bed and showering at times. *Id*. On examination, Ms. Staib was moderately anxious, depressed, and irritable, with cooperative behavior, adequate speech, normal thought processes, and worried thought content. (Tr. 406-07). Bipolar disorder was included in her list of diagnoses. (Tr. 407).

On March 20, 2023, Ms. Staib reported increased irritability and feeling overwhelmed. (Tr. 416). She also reported that she had visited her sister the day before. *Id*. On March 27, 2023, Ms. Staib reported several days of hypomania followed by waking up feeling low, exhausted, and tired. (Tr. 423). She also reported difficulty challenging negative thoughts. *Id*. Ms. Staib reported continued low motivation on April 3, 2023. (Tr. 427). On April 11, 2023, she reported that her depression had decreased and that her anxiety was present at times but was manageable. (Tr. 431). She also reported that she had gone shopping by herself and had engaged in social activities several

times in the past week. *Id*. On examination, her mood was euthymic, and her speech, thought process, and thought content were normal. (Tr. 432).

On May 1, 2023, Ms. Staib reported a depressed mood, poor motivation, and decreased concentration. (Tr. 435). She also reported feeling anxiety about attending a tournament with her boyfriend. *Id*. On May 8, 2023, Ms. Staib reported increased motivation and goal orientation, along with increased irritability and decreased sleep. (Tr. 439). On May 15, 2023, Ms. Staib again reported increased anxiety, including anxiety about her upcoming disability hearing. (Tr. 443). She also reported that she had attended a Mother's Day cookout, which did not trigger her social anxiety. *Id*. On examination, she was mildly depressed, moderately anxious, and restless, with mildly impaired concentration. (Tr. 443-440.

## IV.    THE ALJ'S DECISION

The ALJ first determined that Ms. Staib met the insured status requirements of the Social Security Act through December 31, 2026. (Tr. 19). The ALJ next determined that Ms. Staib had not engaged in substantial gainful activity since August 20, 2021, the alleged onset date. *Id*.

The ALJ further determined that Ms. Staib had the following severe impairments: major depression, bipolar disorder, generalized anxiety disorder, and post-traumatic stress disorder (PTSD). *Id*. However, the ALJ also determined that none of Ms. Staib's severe impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix I. *Id*.

The ALJ next determined that Ms. Staib had the residual functional capacity ("RFC") to:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform simple routine tasks involving no more than simple work-related decision making. The claimant can occasionally interact with others on a superficial basis, superficial being defined as work that does not involve arbitration, negotiation or confrontation. The claimant can perform tasks free of directing the work of others or being responsible for the safety or welfare of others. The claimant can perform tasks free of assembly line work.

The claimant can tolerate occasional workplace changes that are explained in advance.

(Tr. 21).

The ALJ next determined that Ms. Staib was unable to perform any of her past relevant work. (Tr. 27). However, the ALJ determined that, considering Ms. Staib's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Ms. Staib could perform, including work as a cleaner, store laborer, or folder. (Tr. 28-29). Accordingly, the ALJ determined that Ms. Staib was not disabled. (Tr. 29).

## V.     LAW & ANALYSIS

### A.    <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation omitted). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted).

In addition to considering whether substantial evidence supports the Commissioner's

decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.   Standard for Disability

To establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

Consideration of disability claims follows a five-step review process. 20 C.F.R. §404.1520. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d). If the impairment meets or equals a listing and satisfies the durational requirement, the ALJ must find that the claimant is disabled. *See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 Fed. Appx. 426, 431 (6th Cir. 2014).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 404.1520(e). "A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Golden*, 2018 WL 7079506 at *17. However, "[i]t is plaintiff's burden to prove the severity of her impairments, and to provide evidence establishing her RFC." *Lumpkin v. Comm'r of Soc. Sec.*, No. 1:20-CV-1849, 2021 WL 4987607, at *3 (N.D. Ohio Oct. 27, 2021).

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her

from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(g), 404.1560(c). *See Abbott*, 905 F.2d at 923.

### C.    <u>Analysis</u>

Ms. Staib raises a single assignment of error, arguing that the ALJ erred in rejecting Ms. Kohler's opinion and in formulating an RFC that did not incorporate the substantial limitations that Ms. Kohler had identified.

Because Ms. Staib filed her disability claim after March 27, 2017, the "treating physician" rule, pursuant to which an ALJ was required to give controlling weight to an opinion from a treating physician absent good reason not to, does not apply. *See* 20 C.F.R. § 404.1527; *Merrell v. Comm'r of Soc. Sec.*, 1:20-cv-769, 2021 WL 1222667, at *6 (N.D. Ohio Mar. 16, 2021), *report and recommendation adopted*, 2021 WL 1214809 (N.D. Ohio Mar. 31, 2021). Instead, the current regulations stated that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a).

The SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but is "not required to" explain

how the ALJ considered the remaining factors. *Id*.

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. *See* 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. *See* 20 C.F.R. § 404.1520c(c)(2). "As long as the ALJ discussed the supportability and consistency of the opinion and supported his conclusions with substantial evidence within his decision, the Court will not disturb his decision." *Njegovan v. Comm'r of Soc. Sec. Admin.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

Ms. Staib challenges the ALJ's treatment of Ms. Kohler's opinion on both supportability and consistency grounds. The Court concludes that Ms. Staib's arguments with respect to both factors are unavailing.

With regard to supportability, the ALJ found that Ms. Kohler "supported her opinion by stating that the claimant's PTSD and anxiety symptoms interfered with her concentration and focus." (Tr. 25). The ALJ also noted that Ms. Kohler opined that Ms. Staib was easily distracted, had difficulty maintaining personal hygiene, struggled to relate to and trust others, and experienced increased irritability. *Id*. The ALJ concluded, however, that "[d]espite these supporting references," the severity of the limitations that Ms. Kohler identified was not consistent with the record as a whole. *Id*.

Ms. Staib argues that the ALJ's supportability analysis is faulty, and that remand is required, because there is "no basis under the supportability analysis as to how Therapist Kohler

did not support her own opinion." (ECF No. 7, PageID # 486; *see also* ECF No. 11, PageID # 518 (arguing that the ALJ "le[ft] it anyone's guess as to how the overwhelming objective findings from Therapist Kohler . . . do not support her opinion")). As the Commissioner correctly responds, however, Ms. Staib's argument is based on a mistaken premise. The ALJ did *not* find that Ms. Kohler's opinion was unsupported. Instead, the ALJ concluded that Ms. Kohler cited supporting references but that her opinion was inconsistent with the overall record.

To the extent Ms. Staib is arguing that the ALJ was required to adopt the limitations Ms. Kohler identified because the ALJ found that Ms. Kohler cited treatment notes and other medical evidence to support her opinion, her argument is contrary to law. Even where an ALJ finds that an opinion cites to supporting materials, the ALJ is "not . . . required to find that those records ultimately supported" the assessed limitations. *Brooks v. Comm'r of Soc. Sec.*, No. 4:24-cv-0048, 2024 WL 3737900, at \*7 (N.D. Ohio Aug. 9, 2024), *report and recommendation adopted*, 2024 WL 4240995 (N.D. Ohio Sept. 19, 2024). Rather, "it was the ALJ's duty to analyze whether the evidence cited by [Ms. Kohler] supported [her] findings, not to simply wholesale adopt [Ms. Kohler's] findings into the ALJ's ultimate RFC determination." *Id*.

The ALJ did that here, noting that Ms. Kohler's opinion was not consistent with treatment records showing that Ms. Staib had normal memory, intact concentration, insight, and judgment, as well as logical, relevant, goal directed thought processes. (Tr. 25). Many of those findings come from Ms. Kohler's own treatment records. (Tr. 22-25) (citing to treatment notes from Ms. Kohler); *see Cormany v. Kijakazi*, No. 5:21CV933, 2022 WL 4115232, at \*5 (N.D. Ohio Sept. 9, 2022) (holding that ALJ "implicitly" found that opinion was not supported when ALJ concluded that treatment records showed improvements in condition). Thus, Ms. Staib's "complaint is not that the ALJ failed to consider the supportability factor, but rather that she disagrees with the ALJ's decision." *Brooks*, 2024 WL 3737900 at \*7.

The ALJ's decision on the supportability prong is not perfect. The Court agrees that it would have been preferable for the ALJ to more explicitly discuss the records Ms. Kohler relied on and to more clearly explain why the ALJ was not incorporating additional limitations in the RFC despite Ms. Kohler's supporting references. However, "an imperfect paragraph is not fatal to the ALJ's decision, because the court is required to look to the decision as a whole." *Steiner v. Comm'r of Soc. Sec.*, No. 3:21-cv-00074, 2022 WL 2610492, at *10 (N.D. Ohio May 18, 2022), *report and recommendation adopted*, 2022 WL 16945694 (N.D. Ohio Nov. 15, 2022). Reading the decision as a whole—including the ALJ's discussion elsewhere of Ms. Kohler's treatment notes—the ALJ provided sufficient detail for the Court to trace the ALJ's reasoning. Accordingly, Ms. Staib's argument that the ALJ failed to adequately address supportability is without merit.

The Court also rejects Ms. Staib's argument that the ALJ failed to properly evaluate the consistency factor with respect to Ms. Kohler's opinion. As noted above, in finding that Ms. Kohler's opinion was not consistent with the overall record, the ALJ cited to a number of pieces of evidence, including treatment records showing that Ms. Staib displayed normal memory, intact insight and judgment, logical thought processes, and concentration that was often intact. (Tr. 25). The ALJ further cited evidence and testimony that Ms. Kohler functioned in small grounds, volunteered at her stepdaughter's school, shopped at stores, and performed household chores. *Id*.

Ms. Staib argues that the ALJ's analysis was inadequate because the ALJ did not cite to specific pages of specific records when addressing Ms. Kohler's opinion. There is no question that it would have been better for the ALJ to include pinpoint citations. But there is no legal requirement that an ALJ include pinpoint citations, and the ALJ's failure to do so here does not render the ALJ's analysis invalid. *See Newman v. Comm'r of Soc. Sec.*, No. 5:22-cv-01982, 2023 WL 7092886, at *12 (N.D. Ohio Sept. 20, 2023), *report and recommendation adopted*, 2023 WL 7048737 (N.D. Ohio Oct. 26, 2023) ("Although [the ALJ's] omission of specific page numbers is

inconvenient, the omission has no effect on the validity of the ALJ's rationale."). Moreover, the Court reads the ALJ's decision as a whole, *see Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, *8 (N.D. Ohio Sept. 30, 2021), and the ALJ cited specific records—including pinpoint citations—earlier in the decision when discussing Ms. Staib's normal memory, intact concentration, insight, and judgment, and logical thought processes. (Tr. 22-25).

Ms. Staib also accuses the ALJ of mischaracterizing the record by minimizing or ignoring treatment notes showing that she presented with a number of symptoms that would impair her ability to work, including a depressed or anxious mood, irritability, racing thoughts, distractible thought processes, pressured speech, and difficulties with hygiene and motivation. The Court disagrees that the ALJ mischaracterized the record. To the contrary, the ALJ expressly referenced those symptoms earlier in the decision when summarizing Ms. Staib's medical history, noting occasions where Ms. Staib was depressed, restless, anxious, spoke with an increased volume and rapid speech, and displayed racing thoughts and psychomotor agitation. (Tr. 22-25). To the extent Ms. Staib believes the ALJ should have cited to additional records as well, "[i]t is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered" so long as the ALJ does not "selectivity include[] only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability." *Borawski v. Comm'r of Soc. Sec.*, No. 1:20-CV-01091-JDG, 2021 WL 811717, at *15 (N.D. Ohio Mar. 3, 2021); *see also Smith v. Comm'r of Soc. Sec.*, No. 3:18CV622, 2019 WL 764792, at *9 (N.D. Ohio Feb. 21, 2019) ("While the ALJ must consider all the evidence in the record, there is no requirement that the ALJ discuss all the evidence"). The Court concludes that the ALJ did not engage in selective inclusion here.

Moreover, the fact that Ms. Staib identifies evidence that would support a different result is insufficient to warrant remand, as "[t]he substantial-evidence standard . . . presupposes that there

19

is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

Finally, Ms. Staib argues that the ALJ failed to credit her testimony regarding her difficulties with anxiety, including testimony that she cannot handle being around people and must engage in breathing exercises before going into a store or engaging in other activities. But an ALJ is "not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about her symptoms when it is inconsistent with other evidence." *Lumpkin*, 2021 WL 4987607, at *4; *see also Adams v. Comm'r of Soc. Sec. Admin.*, No. 5:21-CV-01465-AMK, 2023 WL 2306672, at *9 (N.D. Ohio Mar. 1, 2023) (the ALJ is "not required to accept [a claimant's] subjective complaints at face value"). The ALJ found that Ms. Staib's statements were not entirely consistent with the record (Tr. 22), and "in practice ALJ credibility findings have become essentially 'unchallengeable.'" *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 476 (6th Cir. 2016) (citing *Payne v. Comm'r of Soc. Sec.*, 402 F. App'x 109, 113 (6th Cir. 2010)).

In sum, while the ALJ's decision was not perfect, the ALJ adequately addressed both the supportability and consistency factors with respect to Ms. Kohler's opinion, and substantial evidence supports the ALJ's determination. Ms. Staib's sole assignment of error is without merit.

## VI.     CONCLUSION

Based on the foregoing, the Commissioner's final decision denying Ms. Staib's application for Disability Insurance Benefits is AFFIRMED.

**IT IS SO ORDERED.**

Dated: October 21, 2024

*/s Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge